## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| HEATHER TESCHNER, | ) | |
| | ) | No. 15 CV 6634 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | December 6, 2016 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Heather Teschner seeks Supplemental Security Income ("SSI") based on her claim that she is unable to work because of impairments including asthma, migraine headaches, obesity, chronic pain, depression, and anxiety. After the Commissioner of the Social Security Administration denied her application, Teschner filed this lawsuit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Teschner's motion is denied, the government's is granted, and the Commissioner's final decision is affirmed:

### Procedural History

Teschner filed her SSI application in May 2010 claiming a disability onset date of October 21, 2001. (Administrative Record ("A.R.") at 229-31.) After her claim was denied initially and upon reconsideration, (id. at 148-57), Teschner sought and was granted a hearing before an administrative law judge ("ALJ"),

which took place on December 8, 2011, (id. at 46-92). On February 14, 2012, the ALJ issued a decision concluding that Teschner is not disabled and therefore not entitled to SSI. (Id. at 105.)

Teschner then sought and was granted review by the Appeals Council. On May 8, 2013, the Appeals Council vacated the ALJ's decision and remanded the case for the resolution of several issues. The Appeals Council directed the ALJ to: (1) obtain additional evidence including a consultative examination; (2) give additional consideration to Teschner's asthma; (3) apply the special technique for mental disorders set out in 20 C.F.R. § 416.920a; (4) re-evaluate the credibility of Teschner's subjective complaints; (5) reconsider her residual functional capacity ("RFC"); and (6) obtain additional evidence from a vocational expert ("VE"). (Id. at 112-14.) The ALJ held a new administrative hearing on November 21, 2013, and issued a decision on January 31, 2014, again concluding that Teschner was not disabled. (Id. at 14-45, 120-39.) When the Appeals Council declined review, (id. at 1-5), the ALJ's decision became the final decision of the Commissioner, *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Teschner filed this lawsuit seeking judicial review of the Commissioner's final decision, (R.1); *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R. 6); *see also* 28 U.S.C. § 636(c).

## Background

In support of her application for SSI, Teschner presented documentary and testimonial evidence.

## A.     Medical Records

Teschner began receiving treatment for migraine headaches from her primary care physician, Dr. Massarat Bala, and other doctors at the Partners in Primary Care Center starting in 2008.  One of her physicians there first noted headaches in February 2008 and prescribed Topomax to prevent the onset of migraine attacks.  (A.R. 371.)  Imitrex was added several weeks later after Teschner appeared at the Northwest Community Hospital complaining of a two-day headache.  (Id. at 352-54, 459.)  A CT scan of Teschner's brain performed at the hospital showed normal results.  (Id. at 351.)  In April 2008, Dr. Bala noted that Teschner's headache symptoms had stabilized, and the remaining 2008 treatment notes do not reflect any further complaints of migraines.  (Id. at 357-67.)  Dr. Bala discontinued Imitrex in 2009, and treatment notes from that year do not reflect any headache complaints except for a May 2009 entry that Teschner's pain was worse. (Id. at 436.)  Otherwise, Dr. Bala merely noted that Teschner's migraines were stable.  (Id. at 423-43.)

The next significant episode of migraine pain came in July 2010, when Teschner complained of a three-day headache and stated that she was weaning off Topomax because it caused memory loss.  (Id. at 565-66.)  In response, Dr. Bala prescribed the pain medication Ultram instead.  (Id.)  Three weeks later, Teschner presented at Northwest Community Hospital complaining of a five-day headache. (Id. at 543.)  She was placed on topiramate, a generic version of Topomax, and by

September 2010 Teschner stated that her head pain was "mild to none." (Id. at 561, 563.)

During her August 2010 hospital visit, Teschner was diagnosed with cervicalgia (pain in the neck). (Id. at 654.) A cervical spine x-ray was taken in May 2011 to examine the causes of her neck and head pain. The results showed no abnormalities in the neck. (Id. at 625.) An August 2011 MRI of the cervical spine was also normal. (Id. at 654.) Teschner told Dr. Bala in April 2012 that she was again having headaches combined with photophobia and phonophobia. (Id. at 773.) Dr. Bala's treatment notes show that Teschner otherwise denied headache pain at all of her other 2012 appointments and never complained of memory loss. (Id. at 767-83.) By contrast, Teschner told another medical provider throughout much of 2012 that topiramate was not helping to relieve her migraines and that she wanted to return to Topomax. (Id. at 848-49.) She stopped taking either topiramate or Topomax at some point after April 2013, which is the last mention of medication in Dr. Bala's notes. (Id. at 761.) The notes from July through November 2013 state that Teschner denied memory loss and had no headaches, with one exception in August 2013. (Id. at 755.)

In addition to headaches, Teschner was also treated for asthma. The record is not clear on when that treatment began, and Dr. Bala's notes from 2008 and 2009 do not mention asthma. (Id. at 423-43.) In December 2009, however, Dr. Mahesh Shah examined Teschner at the request of the Illinois Bureau of Disability Determination Services. (Id. at 398-402.) He diagnosed her with bronchial asthma

that was under "good control." (Id. at 401.)  Dr. Shah did not note that Teschner was taking any medication to control her symptoms, but by January 2010, she was using an inhaler six times daily.  (Id. at 416.)  Treatment notes from 2010 do not reflect any asthma-related complaints, although they show that Teschner's inhaler prescription was changed in February 2010.  (Id. at 415.)

In August 2010, state-agency expert Dr. Calixto Aquino completed a physical RFC assessment concerning Teschner's asthma.  (Id. at 510-17.)  Dr. Aquino opined that Teschner could work at all exertional levels with no postural or manipulative limitations, but should avoid concentrated exposure to fumes, odors, dusts, and gases.  (Id. at 514.)  Another agency expert, Dr. Ernest Bone, considered both Teschner's asthma and migraine pain and affirmed Dr. Aquino's RFC assessment in December 2010.  (Id. at 576.)

By February 2011, Dr. Bala was prescribing albuterol sulfate as Teschner's asthma inhaler.  (Id. at 613.)  Teschner experienced breathing problems related to bronchitis at that time, and she developed a respiratory infection in September 2011.  (Id. at 613, 696.)  But Dr. Bala's notes do not reveal any asthma-related complaints throughout 2011.  (Id. at 591-613, 696-98, 783-84.)  Teschner experienced an asthma flare-up in March 2012 following a pulmonary embolism caused by hormonal supplements.  (Id. at 836.)  Dr. Bala and his associates did not note any other exacerbations of her symptoms, though Teschner was treated for pneumonia in February 2012.  (Id. at 779.)  By 2013, Dr. Bala had added Symbicort to the inhaler that Teschner was using to control her asthma symptoms.  (Id. at

747.)  The medical notes show that Teschner did not complain of any asthma at that time.

While Teschner was being treated for her physical problems, she also sought treatment for depression and anxiety which primarily consisted of periodic counseling visits and medication management.  Dr. Bala prescribed and then discontinued treatment with Wellbutrin in 2008, when he referred Teschner to psychiatrist Dr. Jonathan Gamze.  (Id. at 370, 374, 491.)  Dr. Gamze's handwritten notes are, as the ALJ stated, indecipherable, (id. at 134-35), but his office provided typed transcripts of multiple entries.  These notes reveal that Teschner was "very mildly dysthymic" at her initial consultation in January 2008.  (Id. at 408.)  Even though Teschner was never diagnosed with bipolar disorder, Dr. Gamze prescribed a trial course of Lamictal because one of Teschner's relatives had been diagnosed as having the disorder, and Dr. Gamze speculated that a family history of bipolar disorder might be present.  (Id.)  His one treatment note for 2009 states that her depression was mild.  (Id.)  In the first half of 2010, Dr. Gamze prescribed Sonata to help Teschner sleep, and prescribed Klonopin, a tranquilizer, for anxiety.  (Id. at 688-89.)  The antidepressant medication Abilify was briefly added to Teschner's regimen in July 2010.  (Id. at 689.)  Teschner was euthymic in May 2010 and only mildly dysthymic in December 2010.  (Id. at 689-90.)

Teschner received additional care through counseling with social worker Michelle McCullough at the Salvation Army.  McCullough submitted a letter dated December 21, 2010, stating that she had held six individual and four family

sessions with Teschner and her daughter. (Id. at 582.) She found that Teschner was easily overwhelmed by simple tasks and had not consistently appeared for her appointments. (Id.) A letter submitted on October 25, 2011, echoed the same observation. (Id. at 634.) Despite McCullough's concerns, Dr. Gamze did not note significant difficulties in Teschner's functioning. She was euthymic in March 2011, had no depression in May 2011, and showed no symptoms in December 2011. (Id. at 689-90, 848.) In March 2012, Dr. Gamze discontinued Abilify in favor of Klonopin, noting that Teschner was euthymic in June, July, and October 2012. (Id. at 849.) He also did not note any side effects with Klonopin. (Id. at 850.) Teschner expressed distress in May 2013 but was once again euthymic in July. (Id.)

Several examining and non-examining experts evaluated Teschner's depression and anxiety. Psychologist Randy Kettering, Ph.D., interviewed Teschner on July 20, 2010. Dr. Kettering found her to be euthymic with a broad affect. (Id. at 493.) She could repeat series-seven numbers forward and series-four numbers backwards. (Id.) Based on his observations, Dr. Kettering diagnosed Teschner with a cyclothymic disorder and a personality disorder, NOS (not otherwise specified). (Id. at 494.) State agency psychologist Howard Tin, Psy.D., then reviewed Dr. Kettering's report and completed a Psychiatric Review Technique evaluation on August 6, 2010. (Id. at 496-509.) Dr. Tin also assessed an affective disorder and a personality disorder, NOS, but he concluded that neither condition constituted a severe impairment. (Id. at 496.) He found that Teschner had mild limitations in

her activities of daily living and concentration, no restrictions in social functioning, and had not experienced any episodes of decompensation. (Id. at 506-07.)

Dr. Gamze also provided a mental RFC assessment on March 22, 2011. (Id. at 587-88.) He opined that Teschner's symptoms were triggered by stress and that she was unable to remain focused on her tasks up to 15 percent of an ordinary workday. (Id. at 588.) He further opined that Teschner would also need to miss more than three work days each month because of her symptoms. (Id.) Dr. Gamze then assessed the limitations imposed by Teschner's depression and anxiety, respectively. He found that her depression imposed moderate restrictions in her activities of daily living, social functioning, and concentration, persistence, and pace. (Id. at 589.) He also stated that Teschner had experienced four or more episodes of decompensation in the past two years. (Id.) Dr. Gamze found Teschner's anxiety-related restrictions to be greater, opining that she was markedly restricted in all functional areas and that she had suffered repeated episodes of decompensation. (Id. at 589-90.)

Finally, Teschner underwent another mental status exam in July 2013 after the Appeals Council remanded her case to the ALJ. Dr. Chirag Raval, a consulting psychiatrist, found among other things that Teschner could immediately recall three out of three words posed to her and could recall two of them five minutes later. (Id. at 707.) He did not provide a written narrative of his conclusion, but Dr. Raval diagnosed Teschner with dysthymia and an anxiety disorder, NOS. (Id. at 708.)

**B.      Hearing Testimony**

Teschner testified at both the December 2011 and November 2013 hearings. She stated that she last worked in 2007 in a scrap-booking store, but had to quit her position because of migraine headaches.  (A.R. 50-52.)  She explained that her headaches could be caused by minimal activities such as bending down, could last for days or even weeks at a time, and were accompanied by significant sensitivity to light and sound.  (Id. at 52.)  Teschner said at the first hearing that she went to the emergency room between five and six times within the previous two years for uncontrolled headache pain.  (Id.)  She also testified that she has headaches several times a month, and she later asserted that they are "almost constant."  (Id. at 54, 67.)  At the first hearing, Teschner said that she was experiencing a migraine that had lasted for three weeks.  (Id. at 54.)  At the second hearing, Teschner stated that she had headaches three to five times a week, but that her longest migraine had lasted only four days.  (Id. at 20.)  Teschner explained that she used to take Topomax to treat her migraines, but she switched to Excedrin Migraine because Topomax caused memory loss.  (Id.)  When asked why she had not consulted a neurologist for more specialized treatment, Teschner told the ALJ that she could not find a provider who accepted Medicaid.  (Id. at 31-32.)  The ALJ did not inquire about Teschner's asthma, depression, or other impairments.

As for activities of daily living, Teschner testified that she lives with her mother and her young daughter.  (Id. at 37.)  She helps her daughter prepare for school in the mornings but finds it difficult to get her to school if she misses the bus.

(Id.) Teschner shops for groceries "once in a while" at a store four blocks from her home. (Id. at 38.) She also attends teacher-parent conferences at her daughter's school. (Id.) In her written statements to the Social Security Administration, Teschner claimed that she could prepare whole meals on a good day but could only make quick and simple meals at other times. (Id. at 295.) She can do light housework such as folding laundry and picking up toys a few minutes a day. (Id.) Teschner said she needs to use alarms to remind her to take her medication and to give medicine to her daughter. (Id.) She also needs reminders for daily care activities like brushing her hair. (Id.) Although she likes to leave the house once a day, Teschner stated that her ability to do so depends on whether she has a headache. (Id. at 296.) Most of her time is spent on the computer, reading, and watching TV, though these activities are also limited by fatigue from Teschner's migraines. (Id. at 297.)

Teschner's mother also testified at the first hearing in December 2011. Her mother told the ALJ that Teschner had been placed in special education throughout grammar school and high school. (Id. at 80-81.) She testified that Teschner goes to the hospital for migraine pain so often that it is difficult to keep track of her visits, though the hospital rarely does anything meaningful for her. (Id. at 83-84.) Teschner's mother, however, did not testify about the limitations that migraine pain imposes on her daughter or the frequency of Teschner's headaches. (Id. at 82.)

## C.    Expert Testimony

Psychologist Mark Oberlander, Ph.D., testified at the first hearing in December 2011.  He stated that Teschner suffers from depression, a generalized anxiety disorder, and dependent personality disorder.  (A.R. 61.)  In contrast to Dr. Tin's conclusion, Dr. Oberlander concluded that Teschner's mental impairments are severe.  (Id.)  He said they do not meet or medically equal a listed impairment, but opined that her impairments would create a moderate impairment in her activities of daily living, a mild restriction in social functioning, and a moderate limitation in concentration, persistence, and pace.  (Id. at 62.)  He found no episodes of decompensation in Teschner's history, and determined that Teschner has the functional capacity to carry out simple, repetitive activities, without the need of any other restriction in her ability to work with others.  (Id. at 61-62.)

Another psychologist, Larry Kravitz, Ph.D., testified at the second hearing in November 2013.  He testified that, contrary to Teschner's self-reports to various medical providers, she has never been diagnosed with bipolar disorder.  (Id. at 24.)  Dr. Kravitz agreed with Dr. Oberlander that Teschner's severe mental impairments include depression, anxiety, and a personality disorder.  (Id.)   He assessed their effect on her functioning somewhat differently, finding that Teschner has mild restrictions in her activities of daily living and moderate limitations in social functioning and concentration, persistence, and pace.  (Id.)  Dr. Kravitz also found that Teschner has not experienced any episodes of decompensation.  (Id.)  He opined that she can carry out short and simple tasks but cannot manage the ordinary

stress levels of a workplace or engage in even superficial workplace contacts. (Id. at 25.)

**D.    Vocational Expert Testimony**

A VE also testified at both of the administrative hearings. At the December 2011 hearing, the VE could not identify any work that Teschner had performed since 2000 for more than six months. (A.R. 73-74.) The ALJ asked the VE to consider an individual who was Teschner's age with no past relevant work, no exertional limitations, and who could have frequent but not continuous contact with coworkers, supervisors, or the general public. (Id. at 76-77.) The hypothetical individual should also be protected from glaring lights and should be restricted to receiving only simple instructions. (Id. at 77.) The VE testified that such a person could work as a dishwasher as that job is described in the Dictionary of Occupational Titles ("DOT"). (Id. at 77-78.)

At the second hearing, the ALJ asked a different VE to consider a hypothetical person of Teschner's age with no past relevant work. (Id. at 40.) The individual could carry out light work, as that exertional level is defined under the regulations, and could follow simple instructions, could only occasionally interact with others, and would not be required to engage in joint projects with fellow workers or supervisors. (Id. at 40.) The VE testified that such a person could work as a janitor, a hand packager, or as an inspector. (Id. at 40-41.) The ALJ then asked the VE if the hypothetical individual could perform those jobs if she were absent three or more times a month, or if she were off task more than 15 percent of

the day.  (Id. at 43.)  The VE answered that these additional limitations would eliminate all substantial gainful activity.  (Id.)

**E.     The ALJ's Decision**

On remand, the ALJ evaluated Teschner's claims under the required five-step evaluation process for determining whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520(a).  The ALJ found at step one that Teschner has not engaged in substantial gainful activity since her application date of May 29, 2010.  (A.R. 122.)  At step two the ALJ found that Teschner's severe disorders include migraine headaches, obesity, depression, and anxiety.  (Id.)  At step three, the ALJ determined that none of these impairments meets or medically equals a listed impairment, either singly or in combination.  (Id. at 125.)  Before step four, the ALJ determined that Teschner has the RFC to perform light work as long as she is restricted to understanding and carrying out simple job instructions, has only occasional contact with others, and is not required to engage in joint projects with fellow workers or supervisors.  (Id. at 127.)  At step four, the ALJ determined that Teschner has performed no past relevant work.  At step five, the ALJ concluded that Teschner could perform jobs existing in significant numbers in the local economy such as janitor, hand packager, and inspector.  (Id. at 138.)  Accordingly, the ALJ concluded that Teschner is not disabled.  (Id.)

## Analysis

Teschner raises several challenges to the ALJ's decision.  First, she claims that the ALJ incorrectly assessed the credibility of her testimony.  (R. 11, Pl.'s Mem.

at 5-8, 11-14.)  Second, Teschner contends that the ALJ violated the Appeals Council's remand order by: (1) not including her asthma-related limitations in the RFC; (2) improperly assessing her mental impairments under the special technique used to assess those disorders; and (3) incorrectly considering the opinion evidence of treating and non-treating medical sources.  (Id. at 8-11.)  Third, Teschner argues that the ALJ erred by not asking the VE to identify the source of the job numbers that the VE said existed in the local economy.  (Id. at 14.)

This court's review of the ALJ's decision is "extremely limited," asking only whether the decision is free of legal error and supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (internal quotations and citations omitted).  Because the court's role is neither to reweigh the evidence nor to substitute its own judgment for the ALJ's, if the ALJ's decision is adequately supported and explained it must be upheld even where "reasonable minds can differ over whether the applicant is disabled."  *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).  In order to adequately support the decision the ALJ must build "an accurate and logical bridge from the evidence to her conclusion that the claimant is not disabled."  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (internal quotation omitted).

## A.    Symptom Evaluation

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's condition, the ALJ must then assess how the individual's

symptoms affect her ability to work. SSR 96-7p.[1] The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that she is not credible. The ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); 20 C.F.R. § 404.1529(c)(3). An ALJ's credibility decision must be reviewed with deference and overturned only when the assessment is patently wrong. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

Teschner first claims that the ALJ erroneously discounted the severity of her symptoms because she smokes cigarettes. The ALJ cited Teschner's continued smoking several times as a reason to doubt that she was as limited as she claimed, though the ALJ did not say what part of Teschner's statements was made less believable by that fact. (A.R. 130-32.) The ALJ presumably intended to refer to Teschner's asthma. The addictive nature of smoking, however, makes it "an unreliable basis on which to rest a credibility determination" unless an ALJ first

---

[1] The Social Security Administration recently issued an SSR updating its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new SSR 16-3p supersedes SSR 96-7p, eliminating the term "credibility" from the Administration's sub-regulatory policies in favor of a focus on symptoms evaluation. *Id*. at *1. "The change in wording is meant to clarify that [ALJs] aren't in the business of impeaching a claimant's character," but they "will continue to assess the credibility of pain *assertions* by applicants." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original).

cites evidence that the claimant's condition would significantly improve if she stopped smoking. *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000) (citing 20 C.F.R. § 404.1539(a)); *see also Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985). The ALJ did not do so here, but any error on this point is harmless because Teschner never testified that asthma posed any limitations on her functioning. Indeed, the ALJ found at step two that asthma did not constitute a severe impairment. (A.R. 122-23.) Teschner does not identify any part of her testimony that the ALJ should have considered but overlooked in evaluating the seriousness of her asthma symptoms. (See R. 10, Pl.'s Mem. at 8-11.) Without doing so, she has not shown why the ALJ's reliance on smoking requires further evaluation of her asthma condition.

Teschner also argues that the ALJ erroneously found that her migraine pain was not as severe as she described because she did not seek specialized care to relieve her symptoms. Teschner's counsel told the ALJ that she was unable to find a specialist who would accept Medicaid. (A.R. 30.) An ALJ is required to consider a claimant's reasons for not pursuing medical treatment before construing the claimant's treatment history against her. *See* SSR 16-3p. Here, the ALJ considered what Teschner's attorney said, but pointed out that the record does not confirm that Teschner ever attempted to find a headache specialist. (A.R. 130.) That was insufficient to support the ALJ's reasoning. It is difficult to understand why the record would contain evidence of attempts to find a doctor willing to accept Medicaid. Administrative records do not ordinarily include evidence of phone calls

or emails requesting a doctor's appointment, particularly when they are unsuccessful. The ALJ could have asked Teschner to explain what action she took to obtain a neurologist's appointment, but he did not do so. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.").

Nevertheless, Teschner's lack of treatment by a neurologist was just one part of the ALJ's migraine analysis. The ALJ also noted that Teschner had received only conservative care from her physicians, who prescribed Topomax until it was replaced with non-prescription Excedrin. (A.R. 20.) Teschner contends that the ALJ exceeded his expertise by labelling her care as conservative and then using that characterization to question the severity of her symptoms. (R. 11, Pl.'s Mem. at 10.) But an adjudicator erroneously "plays doctor" by finding that a claimant's care has been conservative only when he ignores relevant evidence and substitutes his own judgment for an expert's. *See Olsen v. Colvin*, 551 Fed. Appx. 868, 875 (7th Cir. 2014). The ALJ did not do so here. To the contrary, the ALJ described the evidence concerning Teschner's migraines in considerable detail but found it insufficient to substantiate her allegations. The ALJ explained, for example, that Teschner's cervical MRI and radiological tests were normal, that she only sought emergency treatment once after she temporarily discontinued Topomax, that her symptoms improved when her medication was restored, that she eventually discontinued

prescription migraine medication, and that many of her consultations with her primary care physician were for complaints other than headaches. (A.R. 131-32.)

Teschner argues that the ALJ erred by relying on these facts to doubt her testimony. She also asserts that the ALJ erroneously required objective evidence of pain even though the cause of pain is frequently unclear. (R. 11, Pl.'s Mem. at 9.) However, Teschner misreads the basis of the ALJ's reasoning. The ALJ did not discount the severity of Teschner's headaches because she failed to produce the appropriate evidence. Rather, the ALJ observed that the hospital and treatment records affirmatively show that Teschner's migraine complaints were fewer and less serious than what she said at the administrative hearings. Teschner claimed at the December 2011 hearing, for example, that she had been to the emergency room up to six times within the prior two years for uncontrolled headache pain. (A.R. 52.) Yet the record does not substantiate that claim. She also told the ALJ that she had headaches several times a month, and at the time of the first hearing, was experiencing a migraine that had lasted for three weeks. (Id. at 54.) But Dr. Gamze's November 2011 treatment notes, which predate the hearing by only ten days, do not mention headaches. (Id. at 691.) In fact, Dr. Gamze stated one month earlier in October 2011 that Topomax was "effective for [Teschner's] headaches." (Id.) None of his notes from 2011 shows that she complained of headaches during that year. (Id. at 690-91.)

Teschner also failed to complain of a prolonged migraine when she saw Dr. Bala in September and October 2011, and again two weeks after the December

2011 hearing. (Id. at 692, 694, 696.) Similarly, the record does not corroborate Teschner's statement at the second hearing in November 2013 that she had headaches three to five times a week. (Id. at 20.) Dr. Bala's treatment notes show that Teschner did not seek treatment for headaches, or even complain of them, when she saw him in July, August, September, or November 2013. Each entry states instead "no headache," even though Teschner was no longer taking Topomax. (Id. at 747, 750, 753, 756, 759.)

As for Teschner's mental impairments, the ALJ criticized Teschner's account of her symptoms because she had only received medication management and had never been hospitalized or subjected to "intensive outpatient treatment." (Id. at 130.) Teschner correctly argues that such reasons are inadequate to support the ALJ's conclusion, at least standing alone. Claimants with depression do not have to receive intensive treatment or be committed to a psychiatric hospital in order to be credible about their symptoms. That is especially the case where, as here, a claimant does not allege the kind of extreme symptoms that might lead a reasonable person to think that hospitalization is in order. *See Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015) ("The institutionalization of the mentally ill is generally reserved for persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking even elementary care of themselves."); *Worzalla v. Barnhart*, 311 F. Supp. 2d 782, 796 (E.D. Wis. 2004) ("[T]here is no requirement in social security law that a claimant requires hospitalization in order to demonstrate a severe mental impairment.").

However, the ALJ properly relied on the fact that Dr. Gamze's treatment notes show significantly less severe symptoms than those that Teschner described at the hearing. (A.R. 132.) Dr. Gamze diagnosed Teschner with "mild depression" in December 2009. (Id. at 688.) By May 2010, she was euthymic. (Id. at 689.) That was true once again in March 2011, and by May 2011 Dr. Gamze noted "no depression." (Id. at 690.) No further depression is recorded in Dr. Gamze's typed notes through the last entry in November 2013. (Id. at 848-50.) The treatment record does indicate that Teschner experienced anxiety that could be severe on occasion. (Id. at 690.) But Dr. Gamze prescribed Klonopin to treat anxiety, and neither Teschner nor Dr. Gamze suggests that the medication was ineffective. Thus when the ALJ's decision is read as a whole, as it must be, *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004), the ALJ adequately explained his reasons for finding that Teschner's mental impairments were not as severe as she described.

Teschner argues that the ALJ could not rely on the effectiveness of the medication she took for depression and headaches without also accounting for their side effects. (R. 11, Pl.'s Mem. at 9.) That is not necessarily the case. *See Labonne v. Astrue*, 341 Fed. Appx. 220, 226 (7th Cir. 2009) ("An ALJ is not required to provide a complete written evaluation of each piece of evidence . . . including the side effects of medication."). Even if that were not true, Teschner fails to cite any complaints of side effects that she made to her medical providers other than memory loss stemming from Topomax. The ALJ accounted for her claims on that topic, as well as her testimony that she experiences dizziness, drowsiness, and

bruising.  (Id. at 130.)  The ALJ then explained that Teschner never complained of memory loss following her 2010 hospitalization for migraine pain and that the record does not support her allegations concerning the other side effects.  (Id.)  The ALJ adequately articulated the basis of his reasoning on this issue.

In addition to the medical record and Teschner's treatment history, the ALJ also relied on her lack of a significant work history to question the severity of her impairments.  An ALJ is entitled to consider a claimant's poor work history when considering claims of disabling symptoms.  *See Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) ("A lack of work history may indicate a lack of motivation to work rather than a lack of ability."); *see also Simila*, 573 F.3d at 520 (finding no error for discounting a claimant's credibility based on decreased earnings). Teschner had last worked in 2006, four years prior to her application date, and she had no past relevant work at step four of the evaluation process.  The VE also testified that she had not held a job for longer than six months since 2000. (A.R. 74.)  The ALJ reasonably explained that her work record, or rather its absence, suggested a lack of motivation to work instead of the disabling symptoms that Teschner alleged.

The ALJ's final reason for discounting Teschner's testimony involved her ability to engage in activities of daily living such as picking up her daughter from school, doing light household work, driving, and attending regular medical appointments.  (A.R. 129.)  Citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012), Teschner argues that the ALJ had no grounds for equating these limited

activities with an ability to perform the RFC of light work. This might be true, had the ALJ relied on Teschner's activities of daily living as direct support for the exertional abilities that are included in the RFC. The ALJ's point, however, was that Teschner's activities cast doubt on her claim that headaches sometimes rendered her unable to function for up to five days at a time. (A.R. 129.) That is a more limited conclusion than claiming that Teschner's activities of daily living demonstrate that she can, say, lift up to 20 pounds at a time or stand or walk up to six hours in a workday. *See* 20 C.F.R. § 404.1567(b).

Teschner argues more persuasively that her mother's testimony at the first hearing corroborates Teschner's activities of daily living and other symptom allegations. The ALJ rejected her mother's testimony on the ground that she is Teschner's mother and is not medically trained. (A.R. 129.) Without further explanation, neither reason supports the ALJ's finding. The regulations permit testimony from "other persons" such as family members without requiring them to have medical training. *See* 20 C.F.R. § 404.1529(c)(3). An ALJ is also prohibited from rejecting a family member's statements because of bias without first explaining what part of such testimony is credible and what is not. *See Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013). That said, the ALJ's oversight of these points amounts to harmless error. Contrary to what Teschner claims, her mother did not confirm Teschner's own statements by describing the frequency of, or the restrictions resulting from, Teschner's migraines. She testified instead on the general treatment that Teschner had received, particularly in hospital settings.

(A.R. 80-85.)  At best, that testimony paralleled what the ALJ already knew from the record but rejected for the reasons discussed above.  Accordingly, Teschner has not shown that a remand is warranted based on the ALJ's evaluation of the severity and frequency of her symptoms.

## B.  The Appeals Council's Remand Order

The Appeals Council's May 8, 2013 remand order directed the ALJ to: (1) review Teschner's asthma condition to determine if it constitutes a severe impairment; (2) evaluate her mental impairments in accordance with the special technique described in 20 C.F.R. § 416.920a; and (3) consider various expert opinions issued by treating and non-examining medical sources.  (A.R. 112-14.)  The ALJ had overlooked all three of these issues in the first decision.  The second decision addresses those issues, but Teschner contends that the ALJ violated the Appeals Council's directive by evaluating each remand topic incorrectly.  The court disagrees.  An ALJ who addresses a remand topic but fails to cite substantial evidence to support her decision does not contravene the Appeals Council's order.  Rather, she commits an independent error that is reviewed like any other issue in the five-step evaluation process that governs disability cases.  *See Poyck v. Astrue*, 414 Fed. Appx. 859, 861 (7th Cir. 2011) (citing *Skinner v. Astrue*, 478 F.3d 836, 841, 844-45 (7th Cir. 2007)).  Teschner's real claim is that the ALJ erred by not providing sufficient reasons to support the RFC assessment that she could carry out light work with various non-exertional limitations.  The court therefore discusses Teschner's claims as they concern the RFC instead of the Appeals Council's order.

### 1.    Asthma

The ALJ's initial decision overlooked both Teschner's asthma and an August 2010 RFC assessment performed by non-examining expert Dr. Aquino.  Dr. Aquino found that Teschner's sole asthma-related restriction was the need to avoid concentrated exposure to fumes, dust, and gasses.  (Id. at 510-17.)  After the case was remanded, the ALJ concluded that asthma was not a severe impairment and that Dr. Aquino's environmental restriction deserved no weight in light of the subsequent medical record.  (Id. at 122-23, 137.)  Teschner disputes the ALJ's conclusion on the ground that she was diagnosed with a pulmonary embolism accompanied by an asthma flare-up in February 2012.  (Id. at 806.)  Teschner fails to explain, however, how the record supports her claim that the ALJ should have assessed additional restrictions based on that event.  Teschner's embolism was attributed to a hormonal supplement, not asthma.  (Id. at 828.)  Regarding her asthma flare-up, the ALJ explained that it had resolved by the spring of 2012.  (Id. at 123.)  Dr. Bala's treatment notes confirm that Teschner did not complain of any asthma symptoms at her April or June 2012 appointments.  (Id. at 770, 773.)  Teschner attempts to bolster her argument by pointing to four treatment notes from 2013, but none confirms her claim that the ALJ overlooked asthma flare-ups.  Two of the notes from August 2013 state that Teschner's asthma was "stable": the entry from September 2013 describing her condition as having an "unspecified status," and the November 2013 note remarking that she was suffering from infection-related bronchitis instead of asthma.  (Id. at 747, 750, 753, 756.)  Thus the ALJ's

review of Teschner's asthma-related symptoms, combined with the absence of evidence that she experienced greater limitations than the ALJ stated, provides substantial evidence for finding that no weight should be given to Dr. Aquino's opinion regarding environmental restrictions.

### 2.    Mental Impairments

The ALJ's first decision failed to apply the special technique that is used at steps two and three of the five-step evaluation process to evaluate the severity of a claimant's mental impairments.  *See* 20 C.F.R. § 404.1520a.  However, relying on the testimony of medical expert Dr. Kravitz, the ALJ found in the second decision that Teschner had a mild restriction in her activities of daily living, a moderate limitation in social functioning, and a moderate restriction in concentration, persistence, and pace.  (A.R. 24, 126-27.)

Teschner argues that the ALJ's analysis of her activities of daily living is erroneous because it does not consider the effects of her migraine headaches. (R. 11, Pl.'s Mem. at 6-7.)  Teschner testified that headache pain limited her daily functioning, and the ALJ agreed that most of her activities of daily living limitations stemmed from migraines instead of depression and anxiety.  (Id. at 126.) But that does not mean that the ALJ was required to include Teschner's migraine-related limitations in the special technique analysis.  The special technique is not designed to assess the restrictions of a claimant's physical impairments or the combined effects of physical and mental disorders.  It is instead "used to analyze whether a claimant has a medically determinable mental impairment and whether

*that impairment* causes functional limitations." *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008) (emphasis added); *see also* 20 C.F.R. § 404.1520a(a) (stating that the special technique is designed to assess "the severity of mental impairments"). The ALJ properly applied this standard by considering how Teschner's depression and anxiety limited her activities of daily living.

Teschner claims that the ALJ's social functioning analysis is also flawed because it relies on activities that are not relevant to that functional domain. (R. 11, Pl.'s Mem. at 7.) The ALJ said that Teschner's social limitations were no greater than moderate because she is able to attend her daughter's extracurricular meetings, can go to a parents' support group, can talk with neighbors and friends, and does not have difficulty in getting along with authority figures in work settings. (A.R. 126.) Far from being irrelevant, as Teschner contends, such activities mirror those that are set out in the regulations. Social functioning is defined as the "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2). Examples of social functioning include the ability to get along with neighbors and family members, participating in group activities, and giving appropriate responses to authority figures in work situations. The ALJ's analysis cited examples of Teschner's activities in these areas, but she does not explain what countervailing evidence the ALJ failed to consider.

As for concentration, persistence, and pace, Teschner mistakenly claims that the ALJ concluded that she has a mild restriction. (R. 11, Pl.'s Mem. at 8.) The

ALJ actually found her limitation to be "moderate." (A.R. 126.) Teschner claims that her own testimony regarding her inability to pay attention, particularly because of memory loss, rebuts the ALJ's finding, but the ALJ properly rejected the extent of Teschner's description of her symptoms' severity for the reasons stated earlier, including that the ALJ considered her claims of memory loss, discussed the temporary discontinuance of Topomax in 2010, and correctly noted that Teschner did not complain of any memory loss after she resumed taking a generic version of that medication. (Id. at 130.) For these reasons, substantial evidence supports the ALJ's analysis of Teschner's concentration and other aspects of the special technique.

### 3. Medical Source Statements

Teschner argues that the ALJ failed to properly evaluate the reports of several treating and non-examining medical sources. (R. 11, Pl.'s Mem. at 11.) The regulations describe six factors that an ALJ should consider when weighing an expert's report. These include the nature and length of the treating relationship, the medical expert's specialization, and the supportability from and consistency with other evidence. 20 C.F.R. § 404.1527(d)(1)-(6). A treating physician's opinion is entitled to controlling weight when it is well supported by the record. Absent a finding that the opinion is unsupported by the record, an expert's opinion cannot be rejected out of hand. "Treating source medical opinions are [] entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927." SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996).

First, Teschner takes issue with the ALJ's dismissal of her chiropractor's opinion. (R. 11, Pl.'s Mem. at 11, 13.) In a May 2011 note, chiropractor Mariann Leahy, D.C., described Teschner's cervical pain and stated that she complained of headaches 51 to 75 percent of her waking hours. (A.R. 681.) But the ALJ explained that Dr. Leahy was not an acceptable medical source, did not assess any of Teschner's functional limitations, and her comments appeared to be based on Teschner's subjective complaints. (Id. at 32, 132, 134.) The ALJ also pointed out that despite Dr. Leahy's findings that Teschner suffered from cervical pain, follow-up radiological studies were unremarkable. (Id. at 124.)

As for the ALJ's evaluation of Dr. Kravitz's testimony and Dr. Raval's July 2013 consultation report, Teschner objects to the ALJ's assignment of great weight to both experts but does not explain why the ALJ should have reached a different conclusion. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments . . . are waived."). At any rate, the ALJ explained that both psychologists had the opportunity to review the complete medical record, were familiar with the regulations that govern disability analyses, and gave opinions that were consistent with the record. (A.R. 134-35.)

Teschner provides a more detailed objection to the ALJ's decision to give no weight to a short letter written by social worker Michelle McCullough on October 25, 2011. (See R. 11, Pl.'s Mem. at 13-14.) McCullough saw Teschner for eight individual counseling sessions and observed that Teschner was easily overwhelmed, had problems staying on task, and would have difficulty in performing full-time

work.  (A.R. 634.)  The ALJ rejected this evaluation, in part because McCullough is not an acceptable medical source under relevant regulations.  *See* 20 C.F.R. § 416.913.  Furthermore, the ALJ went on to explain that McCullough's conclusions are vague, are at odds with the record, and are outweighed by the more specific opinions of Dr. Raval and Dr. Kravitz.  (A.R. 137.)  Again, Teschner does not address why the ALJ's reasoning on this issue is incorrect.

Teschner's treating psychiatrist Dr. Gamze also issued a report concerning her mental restrictions on March 23, 2011.  (Id. at 587-90.)  Dr. Gamze assessed separate mental RFCs for Teschner's depression and anxiety, opining that her depression created moderate restrictions in her activities of daily living, social functioning, and concentration, persistence, and pace.  (Id. at 589.)  He also found that her depression had given rise to four or more episodes of decompensation.  (Id.)  Dr. Gamze's anxiety assessment was more restrictive.  He concluded that Teschner had marked limitations in activities of daily living, social functioning, and concentration because of anxiety and that she would experience repeated episodes of decompensation of extended duration.  (Id. at 590.)  If accepted, therefore, Dr. Gamze's anxiety RFC meant that Teschner is disabled because she meets the criteria for listing 12.06 (anxiety related disorders).  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(B).

The ALJ discussed Dr. Gamze's report at considerable length and decided to assign it little weight.  (A.R. 135-36.)  The ALJ first reasoned that Dr. Gamze's report was inconsistent with the psychiatrist's own treatment notes.  The record

supports this conclusion. As noted above, Dr. Gamze never found Teschner to be more than mildly depressed, and he frequently concluded that she either showed no signs of depression or was euthymic. His treatment notes only mention anxiety twice. Neither entry suggests that it led to any functional limitations, much less the marked limitations or episodes of decompensation that Dr. Gamze assessed in the anxiety portion of his RFC. (Id. at 690-91.)

The severity of Dr. Gamze's assessment created concerns for more than the ALJ. Dr. Oberlander testified at the first hearing that Dr. Gamze's mental RFC assessment suggested that he was not familiar with the guidelines that govern a disability analysis. (Id. at 59.) The ALJ agreed with that conclusion, noting that the record does not show that Teschner had experienced even one episode of decompensation "as defined by the Agency," much less the four episodes that Dr. Gamze identified. (Id. at 136.) The regulations characterize episodes of decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4). Examples can include the need for a structured environment, hospitalization, or a marked increase in symptoms or treatment requirements. *See id*. The ALJ correctly observed that Teschner had never undergone restrictive or involuntary treatment and that the objective record was at odds with the severe findings that Dr. Gamze made on these issues. (A.R. 136.) That adequately explained the ALJ's reasons for finding that Dr. Gamze did not rely on the

regulations' guidelines for defining "marked" restrictions or "episodes of decompensation."

The ALJ further doubted the accuracy of Dr. Gamze's assessment because it conflicted with the findings of Dr. Raval, who opined that Teschner had only mild restrictions in her ability to understand, remember, and carry out simple instructions. (Id. at 135.) The ALJ explained that he gave great weight to Dr. Raval's opinion because he was familiar with the terms used in disability analyses and because his report was consistent with the testimony of Dr. Kravitz and Dr. Oberlander. (Id.) As noted above, Teschner does not explain why the ALJ erred in assigning great weight to Dr. Raval's opinion. An ALJ does not err by giving greater weight to an examining source like Dr. Raval than to a treating source like Dr. Gamze when a conflict exists between the two, and the ALJ adequately explains the basis of his decision. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). The ALJ did so here. Substantial evidence therefore supports the ALJ's conclusions concerning Dr. Gamze's report and the opinions of the other sources the ALJ cited.

## C.    **Step-Five Analysis**

At the second hearing, the ALJ asked the VE if any jobs existed that an individual with Teschner's RFC could perform. The VE identified three employment categories in the local Chicago economy and specified the number of openings available for each job: 1,800 positions as a janitor, 1,200 as a hand packager, and 950 as an inspector. (A.R. 41.) The ALJ did not ask the VE to

identify the source for these numbers or if they accurately reflected what was currently available. Teschner claims that the ALJ's omission was erroneous, citing *Browning v. Colvin*, 766 F.3d 702 (7th Cir. 2014). In *Browning*, the Seventh Circuit noted that ALJs are required to ask VEs if their testimony is consistent with information in the DOT. *Id*. at 709. The problem, as *Browning* explains, is that the DOT was last updated in 1977, describes numerous jobs whose continued existence is in doubt, and does not say how many positions are actually available for any of the employment classifications it describes. *See id*.; *Voigt*, 781 F.3d at 879 (noting that the DOT "does not contain information on which to base an estimate of the number of jobs of a particular kind").

Teschner's reliance on *Browning* and *Voigt* to dispute the ALJ's step-five analysis fails on two grounds. First, neither of those cases found that remand was necessary because the ALJ relied on the VE's unexplained testimony. *See Fitzgerald v. Colvin*, No. 15 CV 135, 2016 WL 447507, at *11 (W.D. Wis. Feb. 4, 2016) (noting that the Seventh Circuit's language in both cases is dicta and did not overrule established precedent allowing an ALJ to accept a VE's unexplained testimony). Second, Teschner fails to account for the fact that she was represented by counsel at the administrative hearing, and her attorney never asked about the basis of the VE's testimony. A claimant waives any subsequent objection to a VE's unexplained testimony on the source of job numbers when her counsel fails to question the VE on that issue at the hearing. *See Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir.

2002)). Teschner has therefore forfeited her objection to the ALJ's reliance on the job numbers stated by the VE.

## Conclusion

For the foregoing reasons, Teschner's motion for summary judgment is denied, the government's is granted, and the Commissioner's final decision is affirmed.

ENTER:

Young B. Kim
United States Magistrate Judge